IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CV-412-BO

| | |
|---|---|
| BAYER CROPSCIENCE LP<br>　　Plaintiff, | )<br>)<br>) |
| v. | )　　ORDER<br>) |
| ALBEMARLE CORPORATION<br>　　Defendant. | )<br>)<br>) |

This cause comes before the Court on cross-motions for summary judgment. The motions have been fully briefed and the matters are ripe for ruling. For the reasons discussed below, summary judgment is entered in favor of defendant on plaintiff's claims and in favor of plaintiff on defendant's counterclaims.

## BACKGROUND

PROCEDURAL HISTORY

Plaintiff (Bayer or BCS) filed this action in Wake County Superior Court seeking a declaratory judgment that defendant (Albemarle) breached its duty of good faith and fair dealing by increasing the price of goods sold to Bayer pursuant to the terms of a sales agreement. Albemarle removed the action to this Court on the basis of its diversity jurisdiction. 28 U.S.C. §§ 1441; 1332. On December 4, 2014, the Court allowed BCS to file an amended complaint asserting a claim for breach of contract in addition to its declaratory judgment claim. The Court subsequently allowed plaintiff to file a second amended complaint to add a claim for violation of North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA). N.C. Gen. Stat. § 75-1.1. Albemarle filed an answer to BCS's second amended complaint and asserted a counterclaim for

breach of contract. Thereafter, the parties filed the instant motions. Bayer has moved for summary judgment in its favor on its claims as well as Albemarle's counterclaim. Albemarle has moved for summary judgment in its favor on Bayer's claims only.

FACTUAL BACKGROUND

BCS, through its predecessor, and Albemarle entered into a sales agreement in early 2000 concerning the sale of methyl bromide by Albemarle to BCS. [DE 53-1]. Methyl bromide is a key ingredient in Bayer's formula for several herbicides that it manufactures at its Kansas City, Missouri plant. Elemental bromide, used create methyl bromide, is available at only a few geological sites around the world, and Albemarle is one of two companies in the United States which has expertise in mining, formulating, producing, and transporting elemental bromine and methyl bromide. Albemarle does not currently manufacture methyl bromide, but rather contracts with its sole competitor in this market, Chemtura, to methylate its elemental bromide, which Albemarle then sells to companies such as BCS. [DE 59-3 ¶¶ 6-7]. The arrangement between Albemarle and Chemtura is referred to as tolling and is subject to a tolling agreement. [DE 59-10].

The 2000 sales agreement provided that Bayer was to purchase from Albemarle 80%, or approximately seven to ten million pounds, of its methyl bromide requirements for its Kansas City plant through 2004, with an automatic one-year renewal subject to termination with notice. The original price was set at $0.5123 per pound. The 2000 agreement contained a price revision term, which allowed Albemarle to raise prices on the first day of any quarter after proper notice. The 2000 agreement also contained a "meet competition" term which provided that should Bayer receive an offer of a lower price on a similar product from a responsible supplier, Bayer could

2

put the offer to Albemarle, who would then be required to either meet the lower price or release Bayer from its obligations with respect to the quantity offered.

The terms of the 2000 sales agreement were amended a total of four times between 2004 and 2010. In the 2010 amendment, Bayer agreed to surrender its "meet competition" right as to the 80% share and further agreed to purchase its remaining 20% requirement from Albemarle, subject to a "meet competition" provision which could only be presented once per year. [DE 53-5]. The price revision term was not modified. In 2005, the price was increased to $.95 per pound; in 2006, the price was increased to $1.10 per pound; in 2009, the price was increased to $1.45 and then $1.58 per pound; in 2010, the price was increased to $1.65 per pound; in 2012, the price was increased to $1.85 per pound.

In February 2014, BCS provided notice to Albemarle that it would exercise its option to terminate the sales agreement effective December 31, 2015. [DE 60-22]. Shortly thereafter, Albemarle raised the price beginning April 1, 2014 to $4.09 per pound. [DE 60-9]. In April 2014, Bayer began to purchase 170,000 pounds (or 20%) of its methyl bromide requirement from Chemtura for $2.30 per pound. [DE 59-20]; [DE 62 at 13]. On June 11, 2014, Albemarle raised the price to $8.43 per pound [DE 60-24] and finally to $11.09 per pound beginning April 1, 2015. [DE 60-11]. On May 5, 2015, Bayer invoked the "meet competition" term of the sales agreement and offered Albemarle the opportunity to meet a competitor's price of $2.49 per pound for 20% of Bayer's methyl bromide volume, which Albemarle declined to do. [DE 60-18; 60-20].

## DISCUSSION

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ.

3

P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

I. *Declaratory judgment and breach of contract claim*

The parties agree that Virginia law governs the sales agreement. [DE 53-1]. The essential elements of a claim for breach of contract under Virginia law are (1) a legal obligation of defendant to plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to plaintiff. *Kraft Foods N.A., Inc. v. Banner Engr. Sales, Inc.*, 446 F. Supp. 2d 551, 568 (E.D. Va. 2006) (citing *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 546 (1989)). As an agreement for the sale of goods, the sales agreement at issue in this dispute is governed by Virginia's enactment of Article 2 of the Uniform Commercial Code (UCC). Va. Code § 8.2-101 *et seq.* Where there is an open price term or the parties have not agreed on a price, a price to be fixed by the seller or the buyer "means a price for him to fix in

4

good faith." Va. Code § 8.2-305. Bayer claims that beginning in 2014 Albemarle's prices for methyl bromide were not fixed in good faith.

Albemarle has asserted the affirmative defense of prior breach. Under Virginia law, "a party who commits the first breach of a contract is not entitled to enforce the contract." *Horton v. Horton*, 254 Va. 111, 115 (1997). Bayer appears to have conceded that it committed a material breach of the contract when it elected beginning in April 2014 to purchase 20% of its methyl bromide volume from a competitor without first employing the "meet competition" procedure provided in the sales agreement. In its response to Albemarle's motion for summary judgment, Bayer states that it "does not dispute that it purchased up to 20% of its methyl bromide from Chemtura in 2014 and that it did not provide Albemarle with written notice of the Chemtura offer as required." [DE 62 at 24]. Bayer further argues that it committed no material breach of the "meet competition" term in 2015, as it provided notice to Albemarle of the competitive offer, but makes no argument which would support a holding that it did not commit material breach beginning in April 2014 by purchasing a competitor's methyl bromide. Bayer's argument against Albemarle's first material breach defense centers on Albemarle's ability to prove damages, an element of a claim for breach of contract. An affirmative defense is distinguishable from a claim for breach of contract, however, and Virginia law does not require a party to prove damages in order to successfully invoke a first material breach defense. *See e.g. Horton*, 254 Va. at 116.

Thus, the issue before the Court has been narrowed as it must decide only whether Albemarle's 2014 price increase prior to Bayer's conceded material breach violated the good faith requirement of Virginia Code § 8.2-305 (§ 8.2-305), making Albemarle the first to have breached the agreement. Any potential violation of § 8.2-305 occurring after Bayer's material

5

breach is of no consequence to Bayer's claims, as Bayer may not seek to enforce the terms of the sales agreement after it has committed a material breach. *See Tandberg, Inc. v. Adv. Media Design, Inc.*, 1:09CV863, 2009 WL 8705814, at *4 (E.D. Va. Dec. 11, 2009) (first material breach rule precludes claims for breach occurring after first material breach).

Prior to April 2014, the price pursuant to the sales agreement ranged from $.51 per pound in 2000 to $1.85 per pound in 2012. After Bayer notified Albemarle that it would be terminating the contract, Albemarle more than doubled the price to $4.09 per pound. Though there is a paucity of case law addressing Virginia's adoption of this UCC provision, the commentary to the Virginia Code notes that where there is an open price term, the seller "may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant." Va. Code Ann. § 8.2-305, Official Comment 3. Thus, "the party that is to set the price does not have the power to act arbitrarily." *Am. Trading & Prod. Corp. v. Fairfax County Bd. of Sup'rs*, 214 Va. 382, 386 (1973).

Other jurisdictions interpreting UCC section 2-305(2) have found it to be primarily concerned with preventing discriminatory pricing "—i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons." *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1347 (D. Kan. 1996). Bayer has not alleged any discriminatory practice by Albemarle in regard to setting prices as between buyers; indeed, the record reflects that during 2014 and 2015 Albemarle sold methyl bromide to only one customer other than Bayer and only on one occasion. [DE 59-1 at ¶ 9]. In the absence of evidence of any discrimination in pricing, Bayer contends that Albemarle acted in a commercially unreasonable manner when it raised its methyl bromide price.

6

There is no specific test for what constitutes commercially reasonable action under the open price provision of the UCC; rather, a court must look to the facts of the case to determine whether conduct is commercially reasonable or unreasonable. *See Autry Petroleum Co. v. BP Products N.A., Inc.*, 4:05-CV-113 (CDL), 2008 WL 360628, at *9 (M.D. Ga. Feb. 8, 2008) (citing *Allapattah Svs., Inc. v. Exxon Corp.*, 61 F. Supp.2d 1308, 1325 (S.D. Fl. 1999)). In the normal case, "market price" or the "posted price" will satisfy the good faith requirement, *see* UCC § 2-305, Official Comment 3, but a "good-faith price under section 2.305 is not synonymous with a fair market price or the lowest price available." *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 437 (Tex. 2004).

The market for methyl bromide is limited, with only two companies, Albemarle and Chemtura, having access to elemental bromine in the United States; only one domestic methyl bromide producer; and sharply declining demand for the product due largely to environmental regulation. [DE 59-3]. There is therefore no fair market price against which to compare the price charged by Albemarle to Bayer. *See e.g. HRN*, 144 S.W.3d at 433 (that price was in line with range of prices charged by other dealers in the relevant geographic market evidence of commercial reasonability).

Albemarle has proffered evidence that in 2014 it began to employ a "value in use" analysis to determine the appropriate price to charge Bayer for methyl bromide. *See* [DE 59-3]. Also in early 2014, Chemtura increased its tolling fee from $.31 per pound to $1.26 per pound. The "value in use" analysis applied after Chemtura's tolling fee increase revealed that Albemarle's cost to produce methyl bromide exceeded the $1.85 per pound price that Albemarle was charging BCS. [DE 59-3 ¶ 15]. In raising the price that it charged Bayer to $4.09 per

7

pound, Albemarle absorbed Chemtura's increased tolling fee and maintained its 60% profit margin on methyl bromide sales to Bayer. *Id.* ¶ 17.[1]

Having reviewed the relevant case law and the evidence of record in this matter, the Court holds that Bayer has not demonstrated that Albemarle acted in a commercially unreasonable manner by raising the methyl bromide price to $4.09 per pound, nor has Bayer demonstrated that a genuine issue of material fact as to this issue exists. That the price increase represented at least in part a pass through of Chemtura's increased tolling fee does not render the price commercially unreasonable, as Bayer's own employee testified that an increase in price to maintain Albemarle's profit margin on methyl bromide, if Albemarle had taken reasonable steps to reduce their inputs, would not be unreasonable. [DE 59-14 at 7]. Nor is there evidence that Albemarle raised the price in bad faith in order to drive BCS out of business. *See Marcoux v. Shell Oil Products Co. LLC*, 524 F.3d 33, 50 (1st Cir. 2008). BCS has further failed to point to any promise by Albemarle regarding price increases that was not kept. *See Flagler Automotive, Inc. v. Exxon Mobil Corp.*, 582 F. Supp. 2d 367, 379 (E.D.N.Y. 2008) ("even assuming *arguendo* that subjective bad faith alone can constitute a breach of the duty of good faith under UCC § 2-305, [] plaintiffs here have failed to set forth any evidence that would create a triable issue as to [defendant]'s dishonesty.").

There is evidence that beginning in November 2013 Albemarle sought to use its leverage over Bayer, and stated that "based on the small volume and the direction the market is taking, treat it like a cash out business and get everything you can out of it as soon as possible." [DE 60-15; 60-16]. Albemarle's intended use of its leverage over BCS does not, however, equate to bad

---

[1] Though Albemarle's global product manager for methyl bromide, Mr. Ware, initially testified at his deposition that Albemarle's profits increased from 20% to 60%, this statement was corrected by Albemarle's submission of its "Business P&L Multi Year by Qtr Detail" statement. [DE 59-13]. *See Scott*, 550 U.S. at 380 (testimony that is contradicted by objective evidence in record does not raise an issue of material fact).

8

faith. At bottom, the sales agreement at issue represents an arm's length transaction between two sophisticated corporations. The agreement included an open price term which allowed Albemarle to raise the price once per quarter of each calendar year with no agreed upon limitation. Moreover, Bayer agreed to an amended sales agreement in 2010 which, *inter alia*, removed its right to invoke the "meet competition" provision as to 80% of its methyl bromide needs. While the good faith requirement of § 8.2-305 governed Albemarle's ability to increase the price, "[t]his Court must [also] respect and enforce the parties' bargain as expressed in their [c]ontract." *Autry Petroleum Co.*, 2008 WL 360628, at *10.

In the absence of a genuine issue of material fact as to whether Albemarle's first price increase in 2014 was arbitrary or commercially unreasonable, the Court holds that Bayer was the first to breach the sales agreement by failing to follow the "meet competition" procedure. Under Virginia law, Bayer may not now seek to enforce the contract that it first breached, and summary judgment is appropriate in Albemarle's favor on Bayer's declaratory judgment and breach of contract claims.

II. *UDTPA claim*

Bayer's UDTPA claim is based on Albemarle's characterization of its price increase effective April 1, 2014, as a pass through of its own increased costs, when Bayer contends that in fact the price increase was primarily driven by Albemarle's desire to increase profit margins. *See* [DE 60-13 at 4 (Mr. Ware stating: "It's a complete 100% pass through. I mean, that's pretty much it. There's nothing in there that's opportunistic or punitive in any way.")].

"In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the act in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*,

9

353 N.C. 647, 656 (2001) (citation omitted). Only where a breach of contract claim is "surrounded by substantial aggravating circumstances" will it support an unfair and deceptive trade practice claim. *Griffith v. Glen Wood Co., Inc.*, 184 N.C. App. 206, 217 (N.C. App. 2007). Moreover, "North Carolina courts are extremely hesitant to allow plaintiffs to attempt to manufacture a tort action and allege UDTP out of facts that are properly alleged as a breach of contract claim." *Jones v. Harrelson and Smith Contractors, LLC*, 194 N.C. App. 203, 229 (N.C. App. 2008) *aff'd,* 363 N.C. 371 (2009). Whether a practice is unfair or deceptive is a question of law. *Dalton*, 353 N.C. at 656.

BCS relies on one statement by Albemarle to support its UDTPA claim. The Court allowed BCS to amend its complaint in order to assert such claim, but Bayer has simply failed to marshal sufficient evidence to demonstrate that egregious or aggravating circumstances surround Albemarle's single statement regarding the basis for its price increase. *Dalton*, 353 N.C. at 657. Indeed, even intentional breach of a contract will not support a UDTPA claim under North Carolina law. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (citations omitted).

Further, Bayer has failed to demonstrate actual reliance. Where a UDTPA claim stems from an alleged misrepresentation, a plaintiff must "demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." *Bumpers v. Comm. Bank of N. Va.*, 367 N.C. 81, 88 (2013). This requires a plaintiff to establish actual and reasonable reliance. *Id.* at 227. In other words, "the deceptive act or practice must have actually mislead [sic] or deceived the plaintiff." *Hageman v. Twin City Chrysler-Plymouth Inc.*, 681 F. Supp. 303, 308 (M.D.N.C. 1988).

Mr. Kandlur, a manager with Bayer and Bayer's 30(b)(6) representative, has testified that he did not believe Albemarle's representation that the increase in price effective April 1, 2014, was because of the tolling fee increase that was being passed on. [DE 59-4 at 179-81]. That Kandlur testified that he could not know whether Albemarle's characterization of the basis for the price increase was true or false because he did not know Chemtura's tolling fee is immaterial to the inquiry. If Bayer did not believe Albemarle's proffered explanation, the explanation could not have deceived Bayer. *Hageman*, 681 F. Supp. at 309 ("a private plaintiff cannot recover in an action for a deceptive trade practice if the plaintiff is unable to prove that the deceptive practice worked."). Albemarle is therefore entitled to summary judgment in its favor on Bayer's UDTPA claim.

III. *Breach of contract counterclaim*

BCS has moved for entry of summary judgment in its favor on Albemarle's counterclaim for breach of contract. Albemarle counterclaims that Bayer breached the sales agreement by purchasing methyl bromide from another source in 2014 and 2015 without providing notice pursuant to the agreement. As stated above, the essential elements of a claim for breach of contract under Virginia law are (1) a legal obligation of defendant to plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff. *Kraft Foods*, 446 F. Supp.2d at 568. Bayer contends that Albemarle cannot demonstrate the requisite damages as to any breach occurring in 2014 and that the record demonstrates that Bayer did not breach the "meet competition" provision in 2015.

The Court agrees that Bayer is entitled to summary judgment in its favor on Albemarle's counterclaim. First, the record demonstrates that Bayer notified Albemarle of Chemtura's competitive price in May 2015, [DE 60-19], and Albemarle has proffered no evidence or

11

argument which would show that a genuine issue of material fact exists as to whether these purchases breached the sales agreement. Albemarle has further failed to respond to Bayer's argument concerning any orders placed with Chemtura in January 2015 but not received, and thus has waived this argument. *See Satcher v. U. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes waiver of that argument.").

As to the 2014 purchases, Bayer has admitted breach but argues that Albemarle cannot demonstrate damages because its representative testified that he could not state whether Albemarle would have, if given the opportunity, met Chemtura's price. [DE 60-33 at 8]. Bayer further argues that Albemarle has not put forth any evidence of its damages in connection with Bayer's 2014 purchases from Chemtura. Albemarle does not expressly oppose Bayer's summary judgment motion on the counterclaim. In its discussion related to its prior breach affirmative defense, which the Court agrees is legally distinct from its counterclaim for breach of contract, Albemarle contends that Bayer should not be permitted to rely on Albemarle's inability to state definitively whether it would have met the competitor's price if the notice procedures were followed in order to demonstrate lack of damages.

The Court holds that Albemarle has failed to proffer sufficient evidence of its damages to resist summary judgment. Albemarle must be able to prove damages with reasonable certainty; "speculation and conjecture cannot form the basis of the recovery." *Carr v. Citizens Bank and Trust Co.*, 228 Va. 644, 652 (1985). Albemarle has not proffered any evidence which would suggest that it would have met the competitor's price in 2014, and "a non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." *LaSalle Talman Bank, F.S.B. v. U.S.*,

317 F.3d 1363, 1371 (Fed. Cir. 2003). Bayer is accordingly entitled to summary judgment in its favor on Albemarle's breach of contract counterclaim.

## CONCLUSION

For the foregoing reasons, Bayer's motion for summary judgment [DE 58] is GRANTED IN PART and DENIED IN PART. Albemarle's motion for summary judgment [DE 59] is GRANTED. Judgment shall be entered in favor of Albemarle on Bayer's claims and in favor of Bayer on Albemarle's counterclaim. The clerk is directed to close this case.

SO ORDERED, this _13_ day of April, 2016.

_Terrence W. Boyle_
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE